# In the United States Court of Federal Claims

No. 23-913
Filed: August 9, 2023[†]
Reissued: December 19, 2023

---

**POINT BLANK ENTERPRISES, INC.,**

    *Plaintiff*,

v.

**THE UNITED STATES,**

    *Defendant*,

and

**ATLANTIC DIVING SUPPLY, INC.,**

    *Intervenor-Defendant.*

---

## ORDER

    Plaintiff Point Blank Enterprises, Inc. ("Point Blank"), challenges the Department of Homeland Security's ("DHS" or "the United States") award of a Blanket Purchase Agreement to Atlantic Diving Supply, Inc. ("ADS") for soft body armor kits.[1] The awarding agency, DHS's Immigration and Customs Enforcement ("ICE"), solicited soft body armor with "enhanced ballistic resistance features" to address "a perilous 'skipping' hazard" posed by bullets deflecting from the top center of the ballistic vest into the throat or head of an officer, thus resulting in death or serious injury. (Administrative Record ("AR")[2] 23; Compl. at 5, ECF No. 1-1). ICE found this threat substantiated by "recent testing by government testing facilities," implicitly referring to a study conducted by the Federal Bureau of Investigation's ("FBI") Ballistic Research Facility ("BRF") in 2020. (AR 23; Defendant's Response to Motion to Complete the

---

[†] This Opinion was filed under seal, and the parties were directed to file a notice of redactions consistent with the Court's instructions. This public version includes the parties' proposed redactions and minor typographical corrections.

[1] The anticipated cost for the BPA is $14,500,000.00. (Administrative Record "AR" 519).

[2] Citations to the record in this Order are from the Administrative Record, (ECF No. 28). Thus, the Court will cite to the record using "(AR __)."

Record ("Def.'s Resp.") at 8–9, ECF No. 40). Though no real-world incidents of this hazard are known, the tragic potential of such a threat cannot be overstated.[3]

In this post award bid protest, Point Blank raises an Organizational Conflict of Interest ("OCI") allegation because TYR Tactical, a manufacturer of the body armor sold by the awardee, played a role in BRF's study that identified the skipping hazard. (Pl.'s Motion to Complete the Record ("Pl.'s Mot.") at 4, ECF No. 32-1). To that end, the pending issues in Point Blank's Motion to Complete and Supplement the Administrative Record seek additional documents that would clarify how the information of the FBI study traveled from the FBI to ICE. (*Id.*).

## I. Background

DHS's initial production of the Administrative Record, certified as accurate and complete, comprised a meager 637 pages, of which—according to Point Blank—only 28 pages contained material substantively related to the research, evaluation, and ultimate decision. (Pl.'s Mot. at 8 (citing AR 485–87 (Evaluation Abstract); 496–506 (Market Research Report); 518–24 (Limited-Sources Brand Name Justification); 565–72 (Award Decision Memorandum); 585–89 (File Memorandum – Award Decision); 611–12 (File Memorandum – Award Decision)). Point Blank moved to complete and supplement the Administrative Record, lodging requests for twelve categories of documents. (*Id.*). Point Blank's request also included an appeal for limited discovery. (*Id.* at 4). In its response to the motion, the United States acceded to completing the Administrative Record with documents that the United States "inadvertently omitted" from its original production. (Def.'s Resp. at 15; *see also* Supplement to the Administrative Record ("AR Supp."), ECF No. 45).

The United States responded to some of the twelve requests by certifying that "nothing additional" remains to complete the Administrative Record. (Def.'s Resp. at 16). In its reply, Point Blank averred that the United States' response and subsequent amendment of the Administrative Record leaves the Court with only two outstanding requests on which the parties remain at odds. (Plaintiff's Reply in Support of Motion to Complete the Record ("Pl.'s Reply") at 2, ECF No. 42 (stating that "of Point Blank's twelve specific requests for the Agency to

---

[3] According to published FBI statistics, 129 law enforcement officers died in the line-of-duty in 2021,73 of which died feloniously, including 61 killed with firearms. *See* FBI Law Enforcement Bulletin, Law Enforcement Officers Killed in the Line of Duty Statistics for 2021, https://leb.fbi.gov/bulletin-highlights/additional-highlights/crime-data-law-enforcement-officers-killed-in-the-line-of-duty-statistics-for-2021 (last accessed Aug. 8, 2023). The FBI maintains historical data related to officers feloniously killed with firearms from 1996 forward. FBI Crime/Law Enforcement Stats (Uniform Crime Reporting Program), https://ucr.fbi.gov/leoka/ (last accessed August 8, 2023). Despite the apparent risk associated with "skipping," the FBI waited approximately 18 months before alerting other agencies. (July 13, 2023 Oral Argument Transcript ("OA Tr.") at 69:17–23). During that time, the FBI addressed the deficiency of their own body armor, but not that worn by officers employed elsewhere. (*Id.* at 73). The justification for this delay is unknown. (OA at 35:8–36:3).

produce documents to complete the record, ten are resolved by" the United States' response)). The Court finds that Point Blank's motion is partially mooted as to those ten points. As to the two remaining requests, the Court finds that the material related to those requests are unnecessary for effective adjudication. Therefore, the Court denies Point Blank's Motion to Complete and Supplement the Administrative Record.

These two outstanding requests pertain to events that occurred before ICE issued the solicitation. (Pl.'s Mot. at 5). The record shows that BRF widely distributed a report that summarized its finding beginning in 2022, first at the Women in Federal Law Enforcement ("WIFLE") Conference and next through a "distribution list to local, state, federal law enforcement," entities. (July 13, 2023 Oral Argument Transcript ("OA Tr.") 51:6–22; A. Scott Peterson, BRF Director, Affidavit ("FBI Aff.") ¶ 12, ECF No. 33-1). The United States contends that DHS employees were informed of the FBI study in two ways: (1) multiple ICE personnel attending the WIFLE conference on August 10, 2022, and (2) Supervisory Special Agent ▓▓▓▓ ▓▓▓▓ with the ICE's Office of Firearms and Tactical Programs ("OFTP") receiving the report from FBI through a distribution list on August 23, 2022. (OA Tr. 51:1–17). Next, the question is how this information was transmitted from OFTP—a policy office—to the contracting officers ("CO") at ICE. The United States presents that the Office of Acquisition ("OAQ") became aware of the skipping hazard and the purported solution in November 2022. (ICE Contracting Officer Tony Ross Affidavit ("CO Aff.") ¶ 8; AR at 496–97 ("In November of 2022, DHS ICE was made aware of a perilous "skipping" hazard . . ."); OA Tr. 53:23–54:3 ("Then the November . . . was when OFTP . . . reached out to Mr. Ross, who is the [CO] . . . and . . . they started the conversation about we need to implement this into . . . how we are acquiring our body armor . . . .")).

As a basis of its OCI Claim, Point Blank asserts that the Request for Information ("RFI") ultimately issued by OAQ in March 2023 and the accompanying Statement of Work incorporate "specifications" jointly prepared by TYR Tactical and FBI. (Pl.'s Mot. at 11). Point Blank notes that documents in the Administrative Record reference ICE's consideration of the FBI study in preparing the solicitation. (*See e.g.*, AR 520 ("ICE/OFTP requires a body armor solution with the ability to overcome the life-threatening 'skipping' hazard identified in an FBI study entitled 'Female Body Armor Risk Identification & Mitigation', prepared by the FBI's Ballistic Research Facility (FBI Study) dated 8/23/2022."), 96 (noting that "ICE leaders" that attended the WIFLE conference presentation then "made OFTP Leadership aware that ICE's requirement must include a counter measure (additional ballistic throat protection). . . .")). Point Blank seeks additional documents including: (1) Communications from OFTP Leadership participants who attended the WIFLE conference, and (2) "[t]he November 2022 communications whereby 'DHS ICE was made aware of a perilous skipping hazard of projectiles when soft armor worn by females and males with disproportionately large chests . . . .'" (Pl.'s Reply at 7). The United States remains adamant that, even if they exist, inclusion of any documents relevant to these two categories in the Administrative Record would be improper. (Def.'s Resp. at 17).

## II.   Analysis

Motions to complete and motions to supplement an administrative record are distinct. The ability to submit additional information into an administrative record (or to supplement) is limited. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). As the

Court has previously stated "the purpose of limiting review to the record before the procuring agency is to prevent courts from using new evidence to 'convert the 'arbitrary and capricious' standard into effectively *de novo* review." *Connected Glob. Solutions, LLC v. United States*, 160 Fed. Cl. 420, 424 (2022) (citing *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)) (emphasis in original). The standard for discovery in bid protest cases is narrower "because the focal point for judicial review is the agency's administrative record." *Id*. Therefore, the Court must grant a request to supplement the administrative record or conduct discovery in a bid protest only if necessary for effective judicial review or if the existing record cannot be trusted. *Axiom*, 564 F.3d at 1380. For motions to complete, on the other hand, the Court must determine if the requested documents are "relevant to the challenged agency decision [and] were considered by the relevant agency decisionmakers," yet "not included in the record." *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019).

      The United States argues that the interagency communications Point Blank seeks "were not developed and considered by the [CO] in making its decision and were not before the decision maker at the time of the final award." (Def.'s Resp. at 17). The United States characterizes the two outstanding requests as only covering "heads up" communications. (*Id*.). The United States argues these communications have limited bearing on the procurement decision because the "downstream analysis" resulting from those talks is already part of the existing record and reflected in the CO's decision. (*Id*.). To the extent that the CO considered any such communication, the United States argues, the communications would also be pre-decisional and privileged. (*Id*.). Point Blank rejects the United States' assertion that the CO did not consider these communications in making its decision. (Pl.'s Mot. at 8 (arguing that the "information undisputedly was considered by the acquisition office")).

      This case implicates allegations of misconduct by ICE, including a CO's failure to identify an OCI. The FAR requires COs, with whom the responsibility of determining OCIs rest, to exercise "common sense, good judgment, and sound discretion" in identifying OCIs and addressing them. FAR 9.505. Like other discretionary agency decisions, the Court's task is to determine if the CO's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law*." AAR Mfg v. United States*, 149 Fed. Cl. 514, 522 (2020) ("An agency's action, including its OCI determinations, must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citing *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011)). The United States maintains that communications with other components of ICE "were not . . . considered by the [CO] in making its decision," (OA Tr. 107:1–16), against the background of an administrative record that is already scant and sparse (including *no* written documents memorializing the CO's OCI analysis).

      The United States' position further obscures the record from which the CO's reasoning for the final determination can be gleaned. The United States' restrictive attitude towards producing materiel that could potentially elucidate the CO's reasoning is further underlined by the naked assertion of deliberative privilege—only volunteered in response to questions during

4

oral argument and in response to the motion to complete.[4] Such blanket assertions of pre-decisional privilege to exclude material from the Administrative Record contradict the common practice endorsed by the Court. *Trace Sys. v. United States*, 160 Fed. Cl. 691, 696–7 (2022) (noting that if "the government believes . . . documents are legally privileged, the proper course would have been to assert a legally protected privilege over those materials and to submit a privilege log . . . ."); *see also Oak Grove Techs., LLC v. United States*, 156 Fed. Cl. 594, 601 (2021) (agreeing with the standard that deliberative documents may be withheld from the record only upon invocation of the deliberative process privilege, as documented in a privilege log); *Xerox Corp. v. United States*, 2021 U.S. Claims LEXIS 3161 *15 (Fed. Cl. Dec. 17, 2021) ("Deliberative materials generated during the decision-making process are part of the whole administrative record *but may be* withheld from the agency-assembled record under the deliberative process privilege.") (emphasis added). The United States has decided to deviate from this common practice by not submitting a privilege log despite continued assertions of privilege.

Nonetheless, the Court does not need to know the contents of the communications covered in Point Blank's two outstanding requests because the focal point of this litigation is the CO's analysis and reasoning. *See AAR Mfg*, 149 Fed. Cl. at 514. The content of other communications is only relevant to the extent that it could help the Court assess how the CO's final determination evinced rational reasoning and consideration of relevant factors. *See Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 143 (D.D.C. 2002) ("Judicial review of agency action should be based on an agency's stated justifications, not the predecisional process that led up to the final, articulated decision."). To the extent that the CO substantiates ICE's decision-making process by referencing documents or discussions otherwise absent from the administrative record, the Court can factor in such gaps and contradictions in evaluating whether the CO acted reasonably. As the Court can only rely on the Administrative Record before it to make its final determination, the United States demurs at requests to paint a fuller picture for the Court at its own peril. *See e.g., Informatics Corp. v. United States*, 40 Fed. Cl. 508, 515–17 (1988) (finding that the CO acted unreasonably by "fail[ing] to document formally her judgment," regarding OCI, thereby making it "virtually impossible to ascertain, in retrospect, whether [the CO] considered," how to avoid or mitigate the apparent OCI.").

The briefing on the adequacy of the Administrative Record is complicated by the United States' motion for leave to file a sur-reply. (ECF No. 46). "[S]ur-replies are generally disfavored" because they often serve as nothing more than "an effort to get the last word." *Am.

---

[4] At oral argument, the United States represented that the CO conferred with agency counsel about the OCI but acknowledged that evidence of such communication does not appear in the administrative record or the declarations submitted. (Def.'s Resp. at 17; OA Tr. 81:4–15 ("My understanding is that there are privileged communications that occurred.")). Similarly, in its response to Point Blank's motion for a temporary restraining order, the United States again asserted "[u]pon reading the allegations the contracting officer conferred with counsel in privileged communications and no further actions were taken." (Def.'s Resp. to Mot. for a TRO at 14, ECF No. 33). This statement also does not cite the record, as the United States has not tendered a privilege log that would mark the existence of such communications, a cryptic and perplexing approach.

*Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 431 (2015). In its reply in support of its motion, Point Blank infers the United States' position to be that ICE "never spoke to or exchanged communications with [BRF Director] Mr. ▮▮▮▮ . . . ." (Pl.'s Reply at 1). The United States' sur-reply primarily conveys the United States' disagreement with this representation, with the United States now claiming, "out of an abundance of caution," that "there *were* communications between ICE and Mr. ▮▮▮▮." (Def.'s Sur-Reply at 2) (emphasis added). The United States now claims that "ICE contacted Mr. ▮▮▮▮ to access the FBI report and determine whether there was additional information regarding the threat beyond the FBI report." (*Id.*). The Court shares Point Blank's confusion because the United States' prior representations created the misapprehension (if not directly endorsed) that the opposite was true: that ICE's contact with the FBI was limited to receiving an email, as a part of a distribution list, containing the report. Page 499 of the Administrative Record, which the United States cites to in its sur-reply as support for the fact that "ICE contacted Mr. ▮▮▮▮ to access the FBI report," does not support such an assertion. (*Id.*). The United States' current assertion renders some of the United States' responses to the Court inquires during oral argument puzzling.

For example, when asked if it is the United States' position that the report obtained by ICE constituted "the entirety of the information that the BRF and TRY developed[]" the United States demurred. It did not inform the Court that ICE had contacts with the FBI about this exact question; instead the United States' response implied that it possessed no special knowledge about that question. (OA Tr. 75:21–76:9 ("I can't speak to that information because I haven't seen it. I assume there is more information regarding testing . . . .")). The United States also made frequent representations that "ICE never consulted with the FBI," without qualifying the breadth of such statement (until now) to clarify that other communication between ICE and the FBI did occur. (*see e.g.*, Def.'s Resp. to TRO at 13 ("ICE did not consult with the FBI BRF to draft the SOW.") (citing to FBI Aff. ¶ 12)).

Here, the United States has used the sur-reply to clarify a statement in its response about the degree of communications between ICE and FBI, as opposed to raising new arguments. (Def.'s Sur-Reply, ECF No. 46-1). The factual admissions in the United States' sur-reply can aide the Court by clarifying the United States' position on the timeline of events in this case, and as such, the Court **GRANTS** the United States' motion for leave to file a sur-reply. (ECF No. 46).

### III. Conclusion

For the stated reasons, the Court **DENIES** Plaintiff's Motion to Complete the Record, (ECF No. 32), as to the two remaining issues identified. The remaining portions of Plaintiff's motion, including the request to conduct limited discovery, are **DENIED-AS-MOOT**.

The Court **ORDERS** the parties to meet and confer and file a Joint Status Report proposing redactions to this Order by **August 16, 2023**.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge