# In the United States Court of Federal Claims

No. 23-913
Filed: August 29, 2023†
Reissued: December 19, 2023

**POINT BLANK ENTERPRISES, INC.,**

    *Plaintiff*,

v.

**UNITED STATES,**

    *Defendant,*

and

**ATLANTIC DIVING SUPPLY, INC.,**

    *Intervenor-Defendant.*

## ORDER

**TAPP, Judge.**

    When ruling on motions for preliminary injunction, the Court has the unenviable task of identifying a legal violation by observing its shadows. In this case, the Court eyes the long shadow of a claimed conflict of interest in a crucial government procurement. In its motion for a temporary restraining order and a preliminary injunction, the disappointed offeror, Point Blank Enterprises, Inc. ("Point Blank"), challenges an award by the Immigration and Customs Enforcement ("ICE" or the "Agency") Office of the Department of Homeland Security ("DHS"), arguing that the procurement disregarded full and open competition by adopting unduly restrictive requirements and is marred by inadequate market research and unmitigated organizational conflict of interest ("OCI"). Although the Court finds that Point Blank has shown a likelihood of success on the merits, the Court denies Point Blank's motion as it finds that the balance of harms favors denial of injunctive relief at this stage.

---

† This Order was issued under seal, and the parties were directed to file a notice of redactions consistent with the Court's instructions below. This public version is issued with the parties' proposed redactions and some minor typographical corrections.

I. Factual Background

The parties arrive at their dispute through a less than straight-forward path beginning with a study conducted by the Federal Bureau of Investigation's ("FBI") Ballistic Research Facility ("BRF") in 2020. (*See* Supplemented Administrative Record ("Supp. AR"), AR 779, 781, ECF No. 45). There is little known about the BRF's motivation to study the efficacy of body armor that particular year, and what little is known seems to be in contention. After obtaining as-worn plastic ballistic gelatin molds in male and female forms, BRF performed "as worn" ballistic testing on its body armors. (Supp. AR 781). This testing discovered a "skipping hazard" issue—whereby a projectile can skip off the top center of the front armor panel and then into the throat area without penetrating the soft body armor panels. (*Id.*). After discovering the skipping hazard, the BRF tested armor currently worn by its agents; this included both TYR Tactical ("TYR") armor but also its contracted legacy body armor, the AX IIIA produced by Point Blank. (*Id.* at 782; Complaint (Compl.) at ¶ 16, ECF 1; Declaration of ▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓ ("FBI Aff.") at ¶ 7, ECF No. 33-1). The BRF later generated a report titled "Female Body Armor Risk Identification & Mitigation" ("FBI Report") summarizing the research and indicating that the BRF observed the skipping hazard with both manufacturers' armors. (Supp. AR 782). Beyond identifying the flaw in the body armor tested, the BRF's report noted that it was "unaware of any armor design which currently addresses this risk factor." (*Id.*)

Specifically, the BRF observed this hazard when the angle of incident (the angle between the threat projectile's line of flight and the front surface of the armor) was not 90-degree oblique. (Supp. AR 783; FBI Aff. at ¶ 9). The report identified women and men with disproportionately large chests as the vulnerable population because of the angle armor lays specifically on those officers. (Supp. AR 781). At the time of the study, Atlantic Diving Supply ("ADS"), the defendant-intervenor in this case and the "only [] authorized reseller [of TYR Tactical soft body armor kits] to federal law enforcement agencies," was supplying the FBI with TYR body armor under a firm-fixed price Blanket Purchase Agreement. (Pl.'s Motion for Temporary Restraining Order ("Pl.'s Mot.") at 16, ECF No. 27-1; FBI Aff. at ¶ 7). Point Blank claims that TYR body armor were supplied as non-developmental items (or in other words items that are previously developed to be used exclusively for governmental purposes). (Pl.'s Mot. at 7).

Per the declaration of Jason Beck, the founder and CEO of TYR, the BRF informed TYR of its concerns about the skipping hazard "during a semiannual performance meeting held as part of the FBI contract." (Declaration of Jason Beck, TYR CEO, (TYR Aff.) at ¶ 6, ECF No. 34-1; *see also* FBI Aff. at ¶ 10 ("As a result of this work conducted by BRF, I approached Tyr Tactical on or about September 3, 2020, and inquired about their ability to find a solution.")). The FBI did not notify Point Blank of this hazard despite determining later that Point Blank's product was likewise deficient. (Pl.'s Mot. at 9).

Subsequently, TYR embarked on developing a new, enhanced product with security to address the skipping hazard. (TYR Aff. ¶ 6). The BRF's goal was to develop a solution that would "be integrated into the soft armor kit, rather than a separate neck attachment," because the BRF believed that neck protections that are externally attached to the armor are used by "few if any FBI personnel . . . ." (FBI Aff. ¶ 11). TYR provided the BRF with the ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ which TYR has since branded as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Compl. at 11–12; *see also* TYR Aff. ¶ ¶ 6,7). TYR was the BRF's sole partner in this endeavor,

with other stakeholders such as Point Blank, the other offerors in this case, and the National Institute of Justice all unaware of BRF's efforts. (Pl.'s Mot. at 7). The resulting BRF report notes that "[t]he efficacy of this product enhancement led the FBI to procure a new set of body armor for every female Special Agent in the FBI," (Supp. AR 785), and Point Blank alleges that "no other manufacturer apart from TYR Tactical was permitted to compete for this award or even provided the specifications or testing parameters FBI had TYR Tactical prepare." (Pl.'s Mot. at 8).

Approximately two years later, the BRF Director presented its findings at the Women in Federal Law Enforcement ("WIFLE") conference in a program titled the "Female Body Armor Risk Identification & Mitigation." (Defendant's Response to Motion for Temporary Restraining Order ("Def.'s Resp.") at 10–11, ECF No. 33). This was the first notice, outside of the FBI, to any other law enforcement personnel. (July 13, 2023 Oral Argument Transcript ("OA Tr.") 69:17–21, ECF No. 36).

Point Blank asserts that this presentation "specifically endorse[d] TYR Tactical over all other soft armor manufacturers (including, specifically, Point Blank)." (Pl.'s Mot. at 8–9). An unknown number of ICE personnel attended the WIFLE conference. (Def.'s Resp. at 12). Following that program, the BRF also "widely distributed its presentation to the law enforcement community," through a distribution list. (OA Tr. 51:14–22). For Point Blank, the reverberations of the BRF's findings in the law enforcement community were a reminder that, despite the old maxim, all publicity is not good publicity. (*See also* Def.'s Resp. at 11 (noting that in the summer of 2022 a document produced by BRF identifying the skip hazard was made "available to law enforcement personnel only via CD")). After federal, state, and local law enforcement customers inquired with Point Blank, Point Blank became aware of the purported skipping hazard. (Pl.'s Mot. at 8). Point Blank made numerous attempts in the aftermath to access more information about the BRF Report from the FBI but was largely unsuccessful. (*Id.* at 10–11 (claiming that Point Blank only obtained "two short video clips" from the FBI)).[1]

Meanwhile, ICE employees who attended the WIFLE Conference subsequently relayed the information about the skipping hazard and ▇▇▇▇▇▇▇▇▇▇ to ICE's Office of Firearms and Tactical Programs ("OFTP"). (OA Tr. 52:8-10). In November 2022, OFTP in turn informed ICE's Office of Acquisition ("OAQ") of the skipping hazard and the potential solution offered by the ▇▇▇▇▇▇▇▇▇▇ technology. (Declaration of Tony Ross, ICE Contracting Officer ("CO Aff.") ¶ 8, ECF No. 33-3; OA Tr. 53:23–54:4). On March 8, 2023, ICE issued a Request for Information ("RFI") contemplating a 60-month Firm Fixed Price Indefinite Delivery Indefinite Quantity to provide 3,500 sets of Level IIIA approved Soft Body Armor Kits. (Supp. AR 1-2, 501). In addition to requiring the body armor to meet the Certified National Institute of

---

[1] The FBI informed Point Blank that the documents Point Blank sought could not be distributed. (Pl.'s Mot. at 10). Although the FBI offered Point Blank a virtual meeting "to have . . . frank discussions and answer some of [Point Blank's] concerns," Point Blank abstained, noting that without reviewing the underlying material first it could not engage in frank discussions with the FBI. (Compl. Ex. 1 at 72, ECF No. 1-1).

Justice ("NIJ") concealable threat level IIIA requirements, the RFI sought "enhanced ballistic resistance features." (Supp. AR 1).

In its initial communications with ICE in response to the RFI, Point Blank notified the Agency that it took issue with the fact that the RFI's specification "referenced a ballistic test/protocol that has not been published nor identified by the Government," and asked if the protocols ICE was relying on could be published. (Compl. Ex. 1 at 118–19). ICE did not respond to that concern. (Pl.'s Mot. at 13).

Four offerors, including Point Blank, responded to the RFI. (Supp. AR 501). Although the RFI does not explicitly mention the FBI or its report, the RFI's language is evocative of the BRF's research. For example, RFI Attachment 1 listed the minimum requirements for the product and specified that the body armor's "[f]ront panel shall have elastic pouch with ballistic fold along top ridge." (Supp. AR 1). The Draft Statement of Work ("SOW") required that the armor should include "a ballistic resistant fold" sewn into its "elastic pouch." (AR 23). The SOW elaborated that the ballistic fold "should be positioned so as to rest along the top ridge of the front panel to catch any upward moving stray projectiles." (*Id.*). In other parts, the SOW stated that the body armor shall include "an internal removable vein behind the soft armor panel to help reduce a push of the soft armor into the area between the breasts." (*Id.*). ICE underlined the requirements listed in the SOW by stating that "recent testing by government testing facilities have discovered a perilous 'skipping' hazard of projectiles when soft armor worn by females and males with disproportionately large chests are shot in an 'as worn condition.'" (*Id.*). The BRF maintains that it had "no input into drafting of [ICE's] body armor requirements[,]" (FBI Aff. at ¶ 12), though these requirements loudly echo the language used by the BRF in the report.

Point Blank responded to the RFI by providing its Capabilities Statement that described its design. (Compl. ¶ 84). Point Blank's response also advised ICE that Point Blank was concerned about the existence of an OCI. (*Id.* at ¶ 86). Point Blank's assertions relied on: "(1) Mr. ▮▮▮▮▮▮▮▮ presentation which endorsed TYR's ▮▮▮▮▮▮▮▮▮▮ for female special agents; and (2) records of [Point Blank's] attempted communications with the FBI to include its Cease and Desist Letter as well as email records from Point Blank to Mr. ▮▮▮▮▮▮▮▮." (Pl.'s Mot. at 15). The letter conveyed Point Blank's position that at least two technical requirements in the RFI—the removable vein and the ballistic fold—had direct origins in testing that Point Blank viewed as flawed and "jointly conducted between the FBI and a single supplier, TYR Tactical." (Compl. ¶ 87). In responding to ICE, Point Blank—and the other unsuccessful offerors—admitted that their body armors did not include a ballistic fold and therefore failed to meet the RFI's requirements. (AR 194, 469, 480). In other words, only TYR managed to meet the enhanced requirements ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

DHS ultimately issued a sole source FFP Blanket Purchase Agreement ("BPA") with the anticipated valued of $14,500,000.00 to ADS. (AR 519). Concurrent with the award, ICE issued a Limited Sources Justification ("J&A") expressing the Agency's position that TYR Tactical armors "have [NIJ] Level IIIA certification," and, for the first time, referenced the FBI explicitly by noting TYR's "unique integrated throat protection which meets FBI benchmark standards for

4

throat protection."[2] (AR 520). ICE relied on FAR 8.405-6(a), which allows agencies to restrict competition in certain cases, including when "[o]nly one source is capable of providing the supplies or services required at the level of quality required because the supplies or services are unique or highly specialized." (AR 519).

## II. Procedural Background

Point Blank identifies three errors with ICE's procurement decision: (1) ICE awarded a sole source contract to procure goods from a contractor who has an unmitigated biased ground rules OCI; (2) ICE included undisclosed and otherwise irrational restrictive specifications that exceed the government's actual needs; and (3) ICE conducted inadequate market research that did not include all the Agency's requirements. (Pl.'s Mot. at 21).

First, Point Blank argues the contract award violates FAR 9.504, which states that contracting officers ("COs") "shall analyze planned acquisitions" to (1) "[i]dentify and evaluate potential [OCI] as early in the acquisition process as possible," and to (2) "[a]void, neutralize, or mitigate significant potential conflicts before contract award." Point Blank's OCI claim is animated by its argument that the Agency knew that TYR Tactical prepared the specifications and testing for the products being procured, and as such only TYR Tactical could meet the requirements. (Pl.'s Mot. at 21).

Next, Point Blank argues that ICE violated the Competition in Contracting Act ("CICA") by imposing requirements that are not rationally related to any legitimate agency needs and are unduly restrictive of competition. (Pl.'s Mot. at 23); *see also* 41 U.S.C. § 3306(a)(1)(A) (requiring agencies to specify "needs and solicit bids or proposals," in a manner that achieves "full and open competition for the procurement."). Point Blank finds ICE's brand-name justification to be undermined by FAR 8.405-6(b)(1) which prohibits brand-name justification unless it is "essential to the Government's requirements," and unless "market research indicates other companies' similar products, or products lacking the particular feature, do not meet, or cannot be modified to meet, the agency's needs." Point Blank insists that it "offers a similar product that meets the Agency's essential requirements," of reducing the skipping hazard, and that ICE's justification to the contrary are pretextual. (Pl.'s Mot. 23–8).

Finally, Point Blank argues that ICE's determination is irrational because it was based on inadequate market research. (*Id.* at 28). Here, the Agency averred that its market research entailed reviewing responses to the RFI and ICE's evaluation of offerors' samples. (AR 520). However, Point Blank notes that even though ICE's sole source justification relied on "FBI benchmark standards for throat protection" as a metric, this metric never appeared in the RFI. (Pl.'s Mot. at 29). Withholding what Point Blank views as a mandatory minimum requirement renders the market research inadequate and the agency's reliance on it irrational. (*Id.*). Point Blank also finds the market research inadequate because ICE's award decision notes ICE's intention to procure 800 body armor "[a]ncillary kits," but before issuing that decision ICE removed the requirement for "Ancillary Scalable Assaulters Plate Carriers" which appeared in

---

[2] Importantly, neither the RFI nor the SOW used the term "FBI benchmark standards." (Pl.'s Mot. at 17; Def.'s Resp. at 22).

the original RFI. (Pl.'s Mot. at 30–32). Lastly, Point Blank casts doubt on whether ICE "meaningfully considered" any products other than TYR's, noting that, despite submitting its sample, Point Blank "has not seen any evidence" indicating that its product "[w]as actually tested." (*Id*. at 31). Having recognized that "injunctive relief is relatively drastic in nature," the Court reviews these claims by Point Blank to determine if Point Blank's "right to such relief is clear." *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007).

### III.   Analysis

The Court may issue temporary restraining orders and preliminary injunctions under RCFC 65 and the Tucker Act. 28 U.S.C. § 1491(b)(2). To prevail on this "extraordinary and drastic remedy," the movant must show that (1) it is likely to succeed on the merits; (2) that it will "suffer irreparable harm" in the absence of preliminary relief; (3) that the "balance of the hardships tips in [its] favor;" and (4) that injunctive relief "will not be contrary to the public interest." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). The movant must carry the burden of persuasion "by a clear showing." *GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 226 (2011). While a protester must establish the first two factors, before an injunction can be granted, no single factor is dispositive. *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). Weakness of the showing regarding one factor may be overborne by the strength of the others, but "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. *FMC Corp.*, 3 F.3d at 427.

#### A.   Likelihood of success on the merits

To succeed on the merits, Point Blank must show that ICE's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4). In bid protests, the Court applies this standard by assessing if the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010). Even if the Court finds error in the agency's conduct, the protester must show that it was prejudiced by that conduct. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Protestors establish prejudice by showing that, "but for the procurement error," there was "a substantial chance" that they would have won the contract award. *Anderson Columbia Envt., Inc. v. United States*, 43 Fed. Cl. 693, 698 (1999); *see also Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1296 (Fed. Cir. 2020) ("A [CO]'s conflict of interest determination will be upheld unless it is 'arbitrary, capricious, or otherwise contrary to law.'") (citing *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010)).

Point Blank alleges that ICE violated the OCI regulations because it awarded a contract "to furnish products from a contract," who "prepare[d] and furnishe[d] complete specifications covering nondevelopmental items, to be used in a competitive acquisition." (Pl.'s Mot. at 21). Point Blank alleges that this conduct falls into the specific category of OCI known as "biased grounds." (*Id*. at 22). In this category of cases, the OCI manifests itself in the very ground rules the agency has set for future contracts, as in cases where contractors participate in the process of setting procurement rules or have "special knowledge" of the agency's future requirements in a way that skews the competition. *See Turner Const. Co., Inc. v. United States*, 94 Fed. Cl. 561,

568 (2010). Providing input on the statement of work or the specifications can be an example of unfair participation in the procurement process when it results in competitive advantage. *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 210 (2011) (citing *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010), *aff'd*, 645 F.3d 1377); *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 773 (2006). Although Point Blank routinely refers to Point Blank's involvement in the BRF's body armor study as "prepar[ing] specifications and testing parameters," that characterization is hotly contested. (*Compare* Pl.'s Mot. at 7, *with* Def.'s Resp. at 17 ("[T]here is no evidentiary support for Point Blank's claims because TYR did not prepare [specifications]."); Intervenor-Defendant's Response to Motion for Temporary Restraining Order ("Intervenor Resp.") at 13, (arguing that Point Blank's claims about TYR's degree of involvement in BRF's study are "unsupported and speculative"), ECF No. 13).

Defendants challenge, on two grounds, Point Blank's assertion that TYR "worked hand-in-hand with the FBI to develop the specification for and testing of a solution" to the skipping hazard. (Pl.'s Mot. at 9). First, Defendants assert that collaboration between TYR Tactical and FBI was minimal and therefore, cannot be characterized as "working hand-in-hand." (*See* Intervenor Resp. at 14 (arguing that the FBI report shows that "TYR was not involved in the FBI's testing of the TYR-designed enhancements.")). Second, the Defendants argue that the collaboration between FBI and TYR did not in any way involve developing specifications or testing parameters. (Def.'s Resp. at 17).

Point Blank's motion supports assertions about the significance of TYR's involvement in preparing specifications by primarily relying on the language the FBI used in its subsequent report. (*See* Pl.'s Mot. at 9). For example, Point Blank extrapolates that phrasing such as "*BRF and TYR Tactical agreed on a product enhancement and testing ensued*," or the fact that the FBI report directed inquiries about the product to TYR evince more extensive involvement by TYR then the Defendants allege. (*Id.*; *see also* AR 783) (emphasis added). The language of the report raises more questions than answers: specifically, about the exact nature of the contractual relationship between the FBI and TYR in 2020, the degree of TYR's involvement in the actual testing, if such collaboration occurred in the context of a procurement, and, even if not, whether TYR's work was later adopted or shaped procurement specifications.

While Defendants vehemently refute these allegations, they do so primarily by relying on affidavits filed by the FBI in response to this litigation. (*See e.g.*, Intervenor's Resp. at 14 (citing to the FBI Affidavit to assert: "[t]he FBI was solely responsible for testing the TYR body armor with ▓▓▓▓▓▓▓ – TYR did not participate in any testing"); Def.'s Resp. at 19 (citing to the FBI Affidavit for the proposition that "TYR developed proposed solutions independent of the FBI, and the BRF tested those solutions independent of TYR" )). And there's the rub. As has been the Court's practice, the Court must exercise restraint in examining information that was not available to the CO and instead only developed before the reviewing Court. *ARINC*, 77 Fed. Cl. at 200–01; *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (focal point of arbitrary and capricious review "should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004) ("After-the-fact rationalizations for agency action should be rejected, and legal arguments for agency actions must find support in the administrative record."); *see also Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 102 (2011) ("Post hoc declarations and arguments will be discounted or disregarded."). Because there is no evidence

that many of the factual assertions critical to refuting the OCI allegations were ever observed or documented by the CO, the Court must review FAR's relevant OCI provisions to determine if the CO's failure to document such facts or its reasoning renders ICE's decision arbitrary and capricious.

FAR Subpart 9.5 governs OCIs in federal procurements. *See* FAR Subpart 9.5. Despite providing specific guidance about handling potential OCIs, FAR 9.505 states that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract." It follows that the FAR requires "common sense, good judgment, and sound discretion," to be reflected in the CO's determination. *Id*. The Court has held that the FAR's OCI provisions collectively convey "that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d at 1374, 1381–82 (Fed. Cir. 2009) (citing FAR 9.505).

In this case, Point Blank grounds its specific OCI claim in FAR 9.505-2 and its prohibition against awarding contracts to companies that "prepare[d] and furnishe[d] complete specifications covering nondevelopmental items, to be used in a competitive acquisition." (Pl.'s Mot. at 22–23). Because Point Blank believes that TYR's involvement in the BRF study matches this definition, Point Blank argues that the CO's silence in response to Point Blank's OCI allegation was unreasonable. (*Id*.).

COs must "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible." FAR 9.504(a)(1). If COs identify potential OCIs during this process, they must then determine if they are significant, because FAR 9.504(a)(2) requires COs to "[a]void, neutralize, or mitigate *significant* potential conflicts before contract award." (emphasis added). The FAR further elaborates: in cases in which a significant conflict of interest is identified, FAR 9.506(b) requires that "before issuing the solicitation," the CO must submit a "written analysis" for "approval to the chief of the contracting office," that includes "a recommended course of action for avoiding, neutralizing, or mitigating the conflict, based on the general rules in 9.505[.]" This reporting is required so that chief of the contracting office can determine the appropriate action based on the CO's recommendation as early as possible. *See* FAR 9.506(c). The head of the contracting agency may then decide to disqualify a contractor if significant OCIs cannot be mitigated but also has the authority to waive the requirements in the OCI regulations if it would "be in the Government's interest." *See* FAR 9.503 (discussing the waiver rule).

Here, Defendants believe that the CO's silence as to the OCI allegations can be justified because the CO exercised his discretion to determine that no "significant" potential conflicts existed; as such, Defendants argue, the CO was under no obligation to document *anything*. (OA Tr. 81:18–24 (Defendant's Counsel: "I think it's consistent with the law . . . ICE was not required, in this scenario, to basically say, [] we've looked at the OCI and whatever. In their assessment, there was not an OCI, it did not warrant further examination"). At oral argument, Defendants also argued that previous case law suggest that in the absence of documentation "the presumption of regularity and good faith," kicks in, shifting the burden of proof to Plaintiff. (*See* OA Tr. 104:20–105:23).

8

The administrative record certainly does not support the Agency's post hoc claim that the CO evaluated the OCI claim and found it lacking. Indeed, the record is utterly silent regarding *any* OCI related consideration by the CO. (*See generally* Supp. AR). Crucially, even though the Agency submitted unsolicited declarations relating to the TRO/PI issue, those declarations are also devoid of any suggestion that the CO considered, much less acted on, Point Blank's OCI claims.

Defendants' positions confuse the Court's previous ruling on the CO's responsibility to document its *preliminary* OCI analysis with the CO's ongoing responsibility to address OCI allegations as they are raised. *Jacobs Tech v. United States*, 100 Fed. Cl. 198, 210–11 (noting that in addition to the FAR's requirement for preliminary OCI analysis, contracting officers have an "an ongoing responsibility to identify and evaluate potential OCIs"). Defendants are correct that the Court, in following Federal Circuit guidance, has previously upheld OCI determinations in the absence of a written analysis by the CO; however, those cases invariably involve post-award allegations of OCI and attacks on the CO's failure to identify that OCI and document an OCI analysis prior to listing the solicitation. *See Turner Constr. Co. v. United States*, 645 F.3d 1377 (Fed. Cir. 2011) (finding that when allegations of OCI surfaced post-award, lack of documentation showing that the CO had analyzed and considered OCIs prior to award did not invalidate agency action); *see e.g.*, *Command Mgmt. Servs. v. United States*, 11 Fed. Cl. 279, 292–93 (2013) (finding no error in the CO's decision to forgo further investigation of OCI because "there was no reason for the CO to suspect, *before the issuance of the Solicitation or the filing of [] bid protest*," that a significant OCI existed) (emphasis added).

*Turner Construction* interpreted FAR 9.504(a) to require COs to document their OCI analysis only when they find a significant conflict of interest to exist. 645 F.3d at 1386. *Turner Construction*'s holding is underlined by its reasoning that "[i]f the first time an allegation or evidence of a potential OCI appears *is after award*, then the earliest time to evaluate that potential OCI as countenanced by [FAR] 9.504(a)(1) might be at that time." *Id.* (emphasis added). Based on that reasoning, *Turner Construction* held that that in those specific cases the mere absence of written documentation by the CO is not by itself evidence of arbitrary and capricious practice. *Id.* Therefore, this Court has read *Turner Construction* to control cases that touch on the adequacy of CO's pre-solicitation OCI analysis and documentation responsibilities when an OCI issue is raised with the CO for the first time after the award. *See e.g.*, *A Squared Joint Venture v. United States*, 136 Fed. Cl. 321, 328 (2018) (finding that the CO's "*preliminary* analysis does not have to be in writing.") (emphasis added). Here however, the lack of any documentation of the Agency's OCI analysis and investigation raises more serious concerns because the allegations and evidence of potential OCI appeared during the procurement and were expressly raised by the offerors. (Supp. AR 191, 655).

Critically, even in *Beta Analytics International, Inc v. United States*—which Defendants relied on to support that the CO does not need to document its OCI analysis—the Court only made that finding (and applied the presumption of good faith) after recognizing that "[a]ll of the information that [the agency] would need to make [its OCI] determination . . . was included in the record." 61 Fed. Cl. 223, 227–28 (2004); (*see also* OA Tr. 105:11–23). As such in *Beta Analytics*, the Court (by reviewing the record before it) could see, just as well as the CO could have, that no serious OCIs existed. 61 Fed. Cl. at 228. That is not the case here, as most of the relevant facts to assess the extent of TYR's involvement in developing the product are not in the

record or could not have been before the CO. *See Samsara Inc. v. United States*, 2023 U.S. Claims LEXIS 1356 *20 (Fed. Cl. May 26, 2023) (noting that "while post hoc rationales are generally disfavored and must be viewed with skepticism," the CO's OCI explanation was reasonable because it was supported by other aspects of the administrative record); (*see also* Def.'s Resp. to Mot. to Complete AR at 14, ECF No. 40 (stating that the written BRF report constituted "all the information" the CO received from BRF in developing "the SOW and the RFI")).

In fact, because many of the relevant facts in this case seem to reside with the FBI—a separate agency—this case also implicates other FAR requirements—namely, FAR 9.506(a). That provision states that "[i]f information concerning prospective contractors is necessary to identify and evaluate [OCIs] or to develop recommendation actions," the CO "first should seek the information from within the Government or from other readily available sources." FAR 506(a) continues to state that "Government sources," include "the files and knowledge of personnel within . . . other contracting offices . . . ." Despite this provision, the record is absent of any evidence indicating that the CO inquired about the details of FBI and TYR's collaboration. (OA Tr. 32:12–18 (Court: "Is there anything at all in the record about DHS's consideration of the claimed OCI?" Plaintiff's Counsel: "No, your Honor. In fact, the only evidence in the record is the exact opposite. ICE makes the representation that it did not consult with the FBI."); *see also* Def.'s Sur-Reply in Opposition to Mot. to Complete AR at 2, ECF No. 46-1 (stating the only communications between ICE and FBI "predate the SOW and the RFI by approximately six months . . . .")).

Defendant-intervenor also argues that FAR 9.504(a) must be read in conjunction with FAR 9.504(d). (OA Tr. 105:1–10). This is also a helter-skelter reading of the FAR's OCI provisions, one made up to match the occasion. The express language of FAR 9.504(d) distances that provision from FAR 9.504(a) in two meaningful ways. First, FAR 9.504(a) speaks of "*significant* potential conflicts," and the CO's duty to mitigate those in the context of evaluating "planned acquisitions,"—as noted, pointing to the pre-solicitation nature of the responsibility. (emphasis added); *see also* 9.504(b) ("*Before issuing a solicitation* for a contract that may involve a *significant potential conflict*, the contracting officer shall recommend to the head of the contracting activity a course of action for resolving conflict.") (emphasis added). In contrast, FAR 9.504(d) does not include any such temporal language and instead speaks to the general "fulfilling" of COs' "responsibilities for identifying and resolving potential conflicts," notably, *excluding* the modifier "significant." And yet more importantly, in delineating when the "contracting officer's judgment need be formally documented," FAR 9504(d) requires such documentation "when a *substantive* issue concerning potential organizational conflict of interest exists." (emphasis added). Substantive is not significant. And the Court must evaluate the FAR provisions in a manner that would give the choices made by its drafters meaning. *See Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("In construing regulatory language, we must read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning."); *Suwannee River Fin., Inc. v. United States*, 7 Cl. Ct. 556, 560 (1985) ("It is axiomatic that regulations must be interpreted to give meaning to every word, particularly where doing so leads to an entirely sensible interpretation of the provision in question."). Therefore, the most sensible reading of the two provisions points to two distinct edicts: FAR 9.504(a) relieves the COs of the burden of documenting the preliminary OCI analysis required for every "planned acquisition," unless any

OCI identified is *significant*, and FAR 9.504(d), relieves the CO of the burden of formal documentation, throughout the procurement, unless any OCI allegations are *substantive*. Though both provisions use similar language, they are not the same.

An agency's decision is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This case presents a rare situation in which the record is devoid of any documented analysis by the CO on the OCI issue even though those allegations were pointedly raised with the CO directly and even though many of the facts relevant to assessing the scope of the OCI were in the United States' possession and not the offerors. At oral argument, the Court persistently inquired about the adequacy of the record. (OA Tr. 106:4–8 (Court: "Is there somewhere in the record that says, we performed an OCI and determined that any risk was insubstantial?" Intervenor's Counsel: "There's nothing in the record, Your Honor . . . .")). The parties' responses confirmed that most of the factual assertions that the United States offers as forming the basis of ICE's determination that no OCI existed are not in the administrative record and are only captured in declarations filed for the purposes of this lawsuit. (OA Tr. 83:11–16 (Court: "If it's not in the declaration [or] the administrative record, how is a court supposed to determine whether DHS's [OCI evaluation] was reasonable?" Defendant's Counsel: "Your Honor, obviously, the declaration could be amended . . .")).

Following oral argument on Point Blank's emergency motion, the United States responded to Point Blank's motion to complete the administrative record by furnishing documents absent from the first production. (*See* Def.'s Resp. to Mot. to Complete AR). The supplemented administrative record also does not contain any documents memorializing the contracting officer's analysis of the OCI issue. (*See generally* Supp. AR). For example, although the United States maintains that the CO had privileged communications with other ICE components about the OCI allegations raised by Point Blank, the United States has not filed a privilege log to substantiate the existence of those communications. *See* FAR 9.504(b) (mandating that COs "obtain the advice of counsel and the assistance of appropriate technician specialists in evaluating potential conflicts and in developing any necessary solicitation provision and contract clauses"); (*see also* OA Tr. 84:1–6 (representing that the CO consulted with agency counsel with regards to OCI claim). Importantly, the Court need not and cannot determine at this juncture whether an actual OCI existed, but given the paucity of information, the Court maintains serious reservations as to whether the Agency's path to its final OCI determination "may reasonably be discerned," from the record currently before the Court. *State Farm*, 463 U.S. at 43. Therefore, although the ultimate determination is left for the opinion on the merits, the Court finds that Point Blank has a reasonable probability of success on its claim that the CO acted unreasonably in reviewing the OCI allegations. *OAO Corp. v. United States*, 49 Fed. Cl. 478, 481 (2001) (finding that to justify a TRO or preliminary injunction, plaintiffs must "generally show a 'reasonable probability' of success on the merits") (citing 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (1995)).

The absence of evidentiary record showing the CO's deliberations about the OCI allegations also mean that Point Blank is more than likely than not to be able to establish prejudice. A long line of cases holds that when a potential significant OCI is identified, prejudice

stemming from that OCI is presumed, unless the evidence shows compelling evidence to the contrary. *See Turner*, 94 Fed. Cl. at 576; *ARINC Eng'g*, 77 Fed. Cl. at 203. As such, the Court finds that Point Blank has demonstrated a likelihood of success on the merits. *Fin. Express LLC v. Nowcom Corp.*, 564 F.Supp.2d 1160, 1169 (C.D. Cal. 2008) (finding that plaintiffs only need to show success on the merits as to one claim to meet the burden for establishing entitlement to a preliminary injunction); *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C 1995) (when "multiple causes of action are alleged," likelihood of success on one claim justifies injunctive relief); *see also Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015) (same).

### B. Irreparable Harm

In identifying irreparable harm, the Court looks for an injury that, "by definition . . . cannot be remedied." *Oklahoma v. United States*, 144 Fed. Cl. 263, 276 (2019). The Court evaluates this factor by determining if the movant has "an adequate remedy in the absence of an injunction." *GEO Grp. Inc. v. United States*, 100 Fed. Cl. 223, 228 (2019) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)).

Point Blank pleads irreparable harm because continuation of the award will mean that Point Blank "will suffer the harm of lost profits," for orders placed with TYR. (Pl.'s Mot. at 33). In addition, Point Blank stresses that it "already has been, and will continue to be, irreparably harmed because the Agency's actions have significantly damaged Point Blank's ability to serve its customers." (*Id.*). Point Blank highlights that ambiguities underlying the Agency's evaluation (its failure to disclose its "actual requirements," "the requisite test parameters," or the "FBI requirements") effectively deprives Point Blank of competing for future procurements that adopt these standards while also preventing Point Blank from addressing any flaws that might exist with its product. (*Id.* at 33–34). The United States asserts that Point Blank will not "lose any profits or the opportunity to fairly compete" in the absence of a preliminary injunction because, if Point Blank ultimately prevails and the Court issues a permanent injunction, Point Blank "will likely have another opportunity to compete for the full contract at issue, or an even larger contract." (Def.'s Resp. at 25–26). To support this assertion, the United States relies on the declaration from ICE officials attesting to the continuing need for body armors beyond the current BPA award. (*Id.* at 25).

The Court has held that a protester suffers irreparable harm if it is "deprived of the opportunity to compete fairly for a contract." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) (quoting *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018). This is because the failure to secure the resulting profit from that competition can constitute significant harm. *See e.g.*, *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998). In this case, Point Blank's harm is attenuated; Point Blank's claims arise in connection with an RFI that did not obligate the Agency to issue any awards. (Supp. AR 2 ("No award will be made from this Sources Sought Notice.")). As such, even if TYR was disqualified from consideration due to an OCI, that would not guarantee any "resulting profit" to Point Blank.

The Court is also not convinced that Point Blank will be left with no "adequate remedy in the absence of an injunction." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 743 (2000)

(citing *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)). The Court has previously granted injunctions when the protestor must wait a "significant period of time" before it is able to compete for the contract again. *See e.g.*, *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 292 (2016). Here, ICE's J&A has already declared that ICE intends to "issue a competitive acquisition in the future to acquire body armor during the [current] BPA ordering period[,]" (AR 523), and the short-term nature of the procurement (a 12-month ordering period) reduces the harm faced by Point Blank. (*Id*.).

Moreover, the Court has previously emphasized that to establish irreparable harm, movants must do more than just "invoke[] the generic, standard legal principles," without any "evidentiary support." *IAP Worldwide Servs. v. United States*, 159 Fed. Cl. 265, 324 (2022). The need for such evidentiary support is heightened in this case because the Court must balance any financial harm imposed on Point Blank against the potential harm associated with law enforcement officers' injury or loss of life. Against the absence of concrete evidentiary support proving the severity of Point Blank's lost profits, Defendant-Intervenor offers contrary evidence: that Point Blank has received seven new government contracts in Fiscal Year 2023, and the United States has obligated over $59 million to Point Blank's contracts during that same time period. (*See* Intervenor's Resp. at 26 (citing to Point Blank Enterprises, Inc., USASPENDING.GOV, https://www.usaspending.gov/recipient/bb1d39b8-bc8e-f58b-2368-856b3a229506-C/latest (last visited July 7, 2023))). Therefore, the evidentiary support weighs against Point Blank.

Furthermore, the Court particularly cannot accept Point Blank's broad assertions of irreparable harm when the harm facing the United States as a result of an injunction is potential loss of life or serious injury to law enforcement officials. *See Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715–16 (2006) (finding that the Court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendants). The declaration from ▇▇▇▇▇▇▇, Supervisory Special Agent, at OFTP adequately explains the potential harm that could be inflicted on ICE agents if delivery of upgraded body armors is delayed. (Declaration of ▇▇▇▇▇▇▇, ("OFTP Aff."), ECF No. 33-2)). The declaration explains that ICE agents are uniquely susceptible to the potential skipping hazard because many of their operations occur inside "residences, commercial buildings, and in and around vehicles." (*Id*. at ¶ 3). Vehicle operations "where the agent is standing outside the vehicle," while the suspect is sitting at a lower angle, or house operations "when the agents are on stairs," conducting search warrants are common operations within ICE; these operations by their nature mimic the dangerous scenarios identified in the FBI report where the attacker's firing angle can create "severe risk of death or serious bodily injury." (*Id*. at ¶ 9; *see also* Supp. AR 783). The Declaration also expresses OFTP's view that the ▇▇▇▇▇▇▇ body armor will immediately improve ICE operations by allowing ICE to use "covert carrier[s]" in "low-profile operations," and in many operations the mere ability to substitute a "neck protector that protrudes above the collar of a t-shirt," for covert integrated neck protection will prevent officers from danger. (OFTP Aff.at ¶¶ 10, 11).

28 U.S.C. § 1491(b)(3) provides that in exercising its jurisdiction, the Court "shall give due regard to the interests of national defense and national security[.]" *See also Ryan v. United States Immigration & Customs Enf't*, 382 F.Supp. 3d 142, 148 (D. Mass. 2019) (noting ICE's dual law enforcement responsibility to address dangers to "national security" and "public

safety"). The Court has previously acknowledged the limited weight given to declarations in resolving legal and factual disputes but has emphasized their importance in helping the Court carryout its obligation under § 1491(b)(3). *See e.g.*, *IAP Worldwide Servs. v. United States*, 159 Fed. Cl. 265, 324 (2022) ("The Court accepts the Major General's Harm Declaration and credits it fully."). Consequently, the Court finds that temporary injunction can result in disrupting the orderly performance of services that are essential to the protection of public safety. *See e.g.*, *Timberline Helicopters, Inc. v. United States*, 140 Fed. Cl. 117, 121 (2018) (denying injunction that could disrupt firefighting and fire suppression services); *Pinnacle Armor, Inc. v. United States*, 2008 U.S. Dist. LEXIS 3831 *17 (E.D. Cal. Jan. 7, 2008) (denying request to enjoin NIJ from removing plaintiff's body armor from the NIJ's Listing of Compliant Armor because "[t]he balance of possible financial harm to plaintiff, as compared to the possible endangerment of law enforcement officers, decidedly tips against granting the preliminary injunction."); *Actionet, Inc. v. United States*, No. 19-388C, 2019 U.S. Claims LEXIS 259 *7–8 (Fed. Cl. Mar. 29, 2019) ("[a]lthough the loss of a contract's total value is often found to be sufficient harm to support a permanent injunction in this court, at the preliminary or temporary injunction stage, the calculus is different."). Therefore, the Court finds that harm factors weigh heavily against Point Blank.

Because the Court finds that Point Blank will not be irreparably harmed in the absence of injunctive relief, the Court denies Point Blank's motion for temporary restraining order and preliminary injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (finding that a plaintiff may not be granted preliminary relief "unless it establishes both of the first two factors . . . likelihood of success on the merits and irreparable harm."); *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction").

## IV.   Conclusion

For the stated reason, the Court **DENIES** Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 27).

The Court **ORDERS** the parties to meet and confer and file a Joint Status Report proposing redactions to this Order by **September 13, 2023**.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge