# In the United States Court of Federal Claims

No. 23-913
Filed: November 27, 2023
Reissued: December 19, 2023[†]

---

**POINT BLANK ENTERPRISES, INC.,**

*Plaintiff,*

**v.**

**THE UNITED STATES,**

*Defendant,*

*and*

**ATLANTIC DIVING SUPPLY, INC.,**

*Intervenor-Defendant.*

---

*Ryan E. Roberts*, Sheppard Mullin Richter & Hampton LLP, Washington, D.C., with *Anne B. Perry*, *Nikole R. Snyder*, and *Lillia J. Damalouji*, of counsel, for Plaintiff.

*Daniel A. Hoffman*, Trial Attorney, with *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., with *Javier A. Farfan*, Associate Legal Adviser, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security, for Defendant.

*Jamie F. Tabb*, Vinson & Elkins, L.L.P, Washington, D.C., with *Elizabeth Krabill McIntyre*, and *Leslie Edelstein*, of counsel, for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

Silence brims with opportunity. Anything can follow silence. But silence is anathema to judicial review. In this sense, scientific inquiry and judicial review share a commonality. The scientific model uses a technique by which, first, a hypothesis is formulated, and then tested through experimentation. Similarly, in judicial review of agency decisions, the administrative

---

[†] This Order was originally issued under seal, and the parties were directed to file a notice of redactions consistent with the Court's instructions below. This public version includes the parties' redactions and some minor typographical corrections.

record provides the rationale for agency officials' decisions, which, when challenged, is tested by the courts for its acceptability. The legitimacy of either discipline against claims of post hoc rationalization rests upon the initial articulation by both the scientist and the official. Scientific inquiry falls short of legitimacy when scientists fail to clearly articulate their hypothesis, begin experimenting, and only then, craft theories to explain the results. Likewise, when contracting officers remain silent, only to announce a rationale after courts test their decisions, administrative governance falls short of *its* standards.

Here, the disappointed bidder, Point Blank Enterprises Inc. ("Point Blank"), challenges the Department of Homeland Security, Immigration and Customs Enforcement's ("ICE" or "the Agency") award of a task order and the Contracting Officer's ("CO") silence in response to Point Blank's organizational conflict of interest ("OCI") allegations. The Court finds that the CO's failure to document ICE's judgment on the OCI claims prevents the Court from adequately reviewing ICE's decision. Therefore, the Court remands to ICE with instructions to document the CO's OCI Judgment with supporting facts and reasoning.

## I.    Factual Background

The Federal Bureau of Investigation's ("FBI") Ballistic Research Facility ("BRF") modified its method for testing the efficacy of ballistic body armor in 2020 by replacing the aluminum mold that would hold sample body armor with a ballistic gelatin mold in both male and female forms. (*See* Supplemented Administrative Record ("AR") 781, ECF No 45). By testing body armor in the "as worn" condition, the FBI discovered that projectiles can "skip" off the top center of the front armor panel into the throat area. (*Id*.). The FBI found that this threat is posed by the angle armor lays on women and certain males with disproportionately large chests. (*Id*.). The report that the FBI ("FBI Report") later produced to summarize BRF's research indicates that BRF observed this threat in the soft body armor produced by BRF's contract provider at the time, TYR Tactical ("TYR"), as well as in the legacy Point Blank body armor. (AR 782).[1]

The FBI Report proceeds to describe BRF's response to its testing: "Consequently, BRF and [TYR] agreed on a product enhancement and testing ensued. What resulted from numerous iterations was the '███████████████.'" (AR 783). BRF then received "'as issued' ███████ ███████ samples" from TYR and tested the efficacy of TYR's body armor with the ███████. (*Id*.). Satisfied with the new design and its ability to stop skipping projectiles, the FBI reported that "[t]he combination of the ██████████████████████████ resulted in a paradigm change in the FBI's ability to protect," officers. (AR 785). The FBI subsequently purchased TYR's enhanced product. (*Id*.).

In August 2022, ICE employees attended the BRF Director's presentation at the Women in Federal Law Enforcement ("WIFLE") conference on the importance of understanding how projectiles interact with female body armor. (AR 452, 496). Those ICE employees later informed

---

[1] Intervenor-Defendant, Atlantic Diving Supply ("ADS"), is the authorized reseller of TYR products. (*See* Compl. at 2 ¶5, ECF No. 1).

ICE's Office of Firearms and Tactical Programs ("OFTP") about the skipping hazard and ███████████, and OFTP in turn informed the Agency's acquisition office. (AR 566).

Apart from what was happening at ICE, in September 2022, Point Blank wrote to the FBI expressing its concerns that the FBI conducted "[f]aulty testing" of its product, questioning the FBI's "improper procurement-sensitive communications with [TYR]," and the FBI's "public endorsement (both written and oral) of [TYR]'s products to law enforcement agencies nationwide." (AR 434–42). The FBI responded to Point Blank by sharing two videos of the testing conducted at the BRF facilities and invited Point Blank to discuss the testing with the FBI. (Compl. Ex. 1 at 73, ECF No. 1-1). Point Blank declined. (*Id.* at 72).

On March 8, 2023, ICE issued a Request for Information ("RFI") seeking up to 3,500 body armor kits that met the National Institute of Justice baseline standard Level IIIA. (AR 1). ICE's RFI also sought "enhanced ballistic resistance features," described as follows: "an internal removal vein behind the soft armor panel to help reduce a push of the soft armor into the area between the breasts and a ballistic resistant fold sewn into an elastic pouch that encapsulates the front panel." (*Id.*). In other words, ICE requested ████████████████ ██████████. (*See* TRO Oral Argument ("TRO OA Tr.") 56:25–57:6, ECF No 36). ICE included an elastic pouch in its requirements "to prevent separation of the fold from the soft armor panel" when the armor is struck by projectiles with "angle of attacks from 32 degrees to 43 degrees in an upward direction and to reduce bulkiness of armor." (*Id.*). The Statement of Work ("SOW") attached to the RFI demanded that all body armor "shall be tested by a U.S. Federal Government ballistic testing facility," to meet or exceed these enhanced ballistic resistance requirements. (AR 8).

Point Blank contacted ICE that month with two concerns: first, that the RFI's minimum requirements and sample instructions contradicted each other (with the latter indicating that ICE was requesting more items than listed in the minimum requirements), and second, that the company wanted more information about the technical specifications. (AR 647). "The specs being cited reference a ballistic test/protocol that has not been published nor identified by the Government," Point Blank told ICE, claiming that this would "make it that much more difficult for industry to reply in kind." (*Id.*). Specifically pointing to the RFI's identification of "a skipping effect," Point Blank told ICE that "in order to combat such an effect," the industry would need to know the "test protocols, threats/projectiles, etc.," so as to "truly assert whether one has a viable solution." (*Id.*). Point Blank's request was that ICE "publish such standard or protocol," that was being cited as a "metric" for procurement. (*Id.*). In response, ICE addressed Pont Blank's first concern by releasing an amended RFI, which removed the "Ancillary Scalable Assaulters Plate Carriers" as a component of the kit minimum requirements, (AR 3, 5), but the Agency did not respond to Point Blank's questions about the RFI's standards.

Four companies responded to the RFI, but ADS—the sole supplier of TYR products— was the only company that submitted body armor with a ballistic ridge. (AR 194, 460, 480). Point Blank's Capabilities Statement described Point Blank's solution to the skipping hazard but also advised ICE of Pint Blank's OCI allegations. (AR 191–94 (Point Blank arguing that "the [] throat and collar offered by Point Blank Enterprises is superior to other," solutions). Point Blank asserted that TYR, at a minimum, "played a role in developing the exact technical specifications that are now included in this RFI." (AR 192). Point Blank claimed that TYR's involvement in

the FBI's "flawed 'testing'" ran afoul of the Competition in Contracting Act ("CICA") by "providing a single company" with an "unfair competitive advantage at the expense of all other soft body armor manufacturers." (*Id*.).

ICE summarized its RFI evaluations in an abstract, indicating that Point Blank failed 12 out of 43 requirements of the RFI. (AR 485–87). ADS's sample (the TYR vest), in contrast, passed all 43 criteria established by ICE. (*Id*.). ICE awarded a contract to ADS on that basis and issued a limited sources justification ("J&A") expressing ICE's rationale for the award. (AR 519). The J&A identified TYR as "the only manufacturer currently capable of meeting OFTP's requirements," as TYR's armor "have [NIJ] level IIIA Certification and have a unique integrated throat protection which meets the FBI benchmark standards for throat protection." (AR 519–520). The reference to the "FBI benchmark standards" was novel, never appearing within the RFI.

## II.    Procedural Background

Point Blank's Complaint raised three challenges: (1) that ICE unreasonably ignored OCI allegations, (2) that ICE's requirements were not rationally related to agency needs and therefore unduly restrictive, and (3) that ICE's market research was flawed. (*See* Compl., ECF No. 1) Point Blank sought both a temporary restraining order ("TRO") and a permanent injunction to restrain the Agency from issuing any orders to the awardee under the contract. (*Id*. at 3; *see also* Pl.'s Motion for Temporary Restraining Order ("Pl.'s TRO Mot."), ECF No. 27).

After Point Blank moved for a TRO, the United States, in opposition, tendered and relied on three declarations from (1) the BRF Director ("BRF Declaration"), (2) the CO ("CO Declaration"), and (3) Supervisory Special Agent for ICE OFTP ("OFTP Declaration"). (*See* Def.'s Resp. to TRO Mot. Exs. 1–3, ECF Nos. 33-1–3). After the Court scheduled oral argument on the TRO request, Point Blank moved to complete and supplement the administrative record and asked for leave to conduct limited discovery. (*See* Pl.'s Mot. to Complete, ECF No. 32-1). That motion pointed to a specific gap in the administrative record, noting that while the J&A referenced ICE's reliance on the "FBI benchmark standards" as "outlined in the attached FBI study," no FBI study was included in the administrative record. (*Id*. at 11). Point Blank also sought to complete the record with any other missing information that ICE relied on to understand the "skipping hazard" or to decide to "include the TYR[ ]/ FBI specifications as requirements in the SOW and RFI." (*Id*.). Point Blank also requested leave to depose the BRF Director who Point Blank claimed worked with TYR "to develop the specifications" for the changes to soft body armor that were later adopted by ICE. (*Id*. at 17).

With the motion to complete pending, the Court's oral argument on the TRO motion largely focused on the allegations raised about the inadequacy of the record, with the Court expressing its discomfort with "conducting a [TRO] hearing with an incomplete record." (TRO OA Tr. 6:4–9). At the TRO hearing, the United States stated its belief that "the AR [is] complete based on the CO's representation," (TRO OA Tr. at 49:11–13), but conditioned that statement. Specifically, the United States expressed its position that certain communications about Point Blank's OCI claim were kept out of the administrative record because the United States believed them to be outside the scope of the administrative record. (TRO OA Tr. 49:19–23 (acknowledging that certain "communications, emails" are not in the administrative record

because "there's also a question of where the AR starts and stops in this case . . . .")). The United States also professed its position that the CO relied on evidence in the administrative record to determine that no OCI existed, including facts contained in Point Blank's letter as well as the FBI report. (*See* TRO OA Tr. at 79:9–19 (noting that ICE "looked at the material that Point Blank provided in their letter," and has "gone back and looked at the report")). However, the Court's exchanges with Defendants also revealed that many lines of arguments advanced by Defendants to address the OCI allegations could not be firmly grounded in evidence included in the current administrative record.[2]

After the TRO hearing, the United States responded to Point Blank's motion to complete by supplementing the administrative record to include (1) a copy of the FBI report, (2) correspondence between offerors and ICE that was not previously included, and (3) records of an earlier protest against ICE's earlier related solicitation. (*See* Def.'s Resp. to Mot. to Complete, ECF No. 40). In this response, the United States attested that "[t]he FBI report is also all the information related to the skipping hazard that ICE relied on to develop the requirements in the SOW and the RFI." (*Id*. at 14). The United States responded to another set of Point Blank's requests (such as those for other records that ICE might have considered in its market research or to develop the SOW) by responding that "nothing additional" was left out of the administrative record. (*Id*. at 16).

The United States also opposed two of Point Blank's requests on legal grounds: these included communications from OFTP leadership participants who attended the WIFLE conference and any more information about how ICE was made aware of the skipping hazard. (*Id*. at 17–20). The United States argued that any such records, if in existence, would be part of interagency communications "not developed and considered by the [CO] in making its decision and were not before the decision maker at the time of the final award." (*Id*. at 17). To the extent that the CO considered any such communications, the United States argues, the communications would also be pre-decisional and privileged. (*Id*.).

In its order on the remaining issues from the motion to complete the record, the Court highlighted the "scant" nature of the administrative record in this case, particularly the glaring

---

[2] For example, at the TRO hearing, the United States pursued a line of argument that no OCI could exist premised on the fact that FBI and TYR did not exchange "testing protocols," (TRO OA Tr. 77:8–14); after being asked to clarify how that can be gleaned from the record, the United States responded that it can be established from the BRF Declaration, adding however that ". . . that's not . . . technically part of the administrative record." (*Id*. at 77:23–4). Likewise, the United States argued that the CO's decision to not further pursue the OCI allegations could have been informed by the CO's own knowledge that ICE had limited contact with the FBI. (*Id*. at 81:1–3). The Court inquired: "Is that in the administrative record somewhere that they were thinking that?" The United States' short response was that it is not. (*Id*. at 81:4–9). Similar pattern emerged in exchanges with Intervenor-Defendant. For example, in response to the Court's question as to whether TYR had access to the FBI report before it was distributed widely to law enforcement, ADS responded in the negative. (*Id*. at 102:17–19). "Where do I find that in the record?" the Court followed-up. (*Id*. at 102:24). ADS responded that "[t]hat would not be in the record," but instead in the TYR Declaration. (*Id*. at 102:25-103:1).

absence of any "written documents memorializing the CO's OCI analysis." (Order on Mot. to Complete at 4–5, ECF No. 83). The Court stated that the content of any other communications sought by Point Blank (and withheld by the United States) could be relevant in painting a more fulsome picture of the CO's determination. (*Id.*). In particular, the Court noted that the United States' buttoned-up approach in invoking privilege without submitting a privilege log, "contradict[s] the common practice endorsed" by the Court and adds to this problem. (*Id.*). However, the Court found that any gaps arising as a result of those records' absence, could simply be factored into the Court's analysis as to whether the CO's determination can be gleaned from the record. (*Id.*). The Court therefore denied Point Blank's motion to complete the record as to the remaining issues.

Regarding Point Blank's TRO motion, the Court reviewed the supplemented administrative record and found it to be "utterly silent regarding any OCI related consideration by the CO." (TRO Order at 9, ECF No. 84). The Court also found that "many of the factual assertions" presented by Defendants as critical to refuting the OCI allegations were not documented by the CO in the administrative record. (*Id.* at 10). The Court also found unconvincing Defendants' argument that FAR 9.504(a) and 9.504(d) conclusively control this case or dictate that the CO was under no obligation to document any OCI analysis. (*See id.* at 11 ("This case presents a rare situation in which the record is devoid of any documented analysis by the CO on the OCI issue even though those allegations were pointedly raised with the CO directly and even though many of the facts relevant to assessing the scope of the OCI were in the United States' possession and not the offerors.")). While noting that "the Court need not and cannot determine," at that juncture "whether an actual OCI existed," the Court found that Point Blank was "more likely than not" to succeed on its claim that the CO improperly ignored the OCI allegations and that Point Blank was prejudiced by that error. (*Id.* (finding that "given the paucity of information, the Court maintains serious reservations as to whether the Agency's path to its final OCI determination may reasonably be discerned, from the record currently before the Court.") (cleaned up)).

However, the Court denied Point Blank's motion for TRO, finding an absence of irreparable harm. (*Id.* at 12–14). That decision was influenced by a number of findings: (1) that the particular solicitation (an RFI) would not have guaranteed Point Blank an award even if TYR was disqualified because of an OCI; (2) that the short-term nature of the procurement (and the pendency of a larger procurement for the same product) meant that offerors would not be denied an opportunity to provide the goods in the absence of an injunction; and (3) that the balance of financial harm against the potential risk to law enforcement officers weighed against issuing an injunction.[3] (*Id.*)

The United States then sought to amend the administrative record, (*See* Def.'s Mot. to Amend., ECF No. 67), arguing that it intended "to clarify the action that it took regarding the OCI and respond to plaintiff's more recent allegations." (*Id.* at 1). At a hearing to consider the United States' motion, the Court addressed two issues: whether the Court's rules allow for such

---

[3] Defendants subsequently notified the Court that upgraded armor was shipped to ICE and issued to law enforcement officers with other shipments pending after the Court's order denying TRO. (MJAR OA Tr. 18:6–20, ECF No 73).

amendment at-will, pointing out that RCFC 52.1 explicitly requires "[t]he court" to establish the "time for filing the administrative record by order," (*See* Mot. to Amend. OA Tr. 23:6–11, ECF No. 71), and the Court's concerns that the information gathered at-will by the United States selectively omits details that could otherwise be included in the amended record, if such amendment was pursuant to Court's remand order instead. (*Id.* at 15:1–22:24 (noting that "when the court remands something . . . the Court instructs the party," as to what is "lacking" as opposed to "one side . . . freewheeling the information that the Court receives.")); *see also* 28 U.S.C. § 1491(a)(2) (granting the Court the power to remand appropriate matters to any administrative or executive body or official "with such direction as it may deem proper and just."). For those reasons, the Court denied the United States' motion to amend the administrative record. (*See* Mot. to Amend. OA Tr. 53:7–55:7; *see also* Order on Mot. to Amend, ECF No. 68).

## III.    Analysis

### A.  *Standard of Review*

The Court reviews challenges to agency decisions based on the Administrative Procedure Act's standards. 5 U.S.C. § 706; *see also* 28 U.S.C. § 1491(b)(4). Accordingly, the Court may hold unlawful and set aside agency decisions if they either (1) lack a rational basis or (2) involve a violation of regulation or procedure. *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1329 (2004). If a challenge is based on the first ground, the protestor can prevail by showing that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before" it or reached a decision that "could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When a challenge focuses on the second ground, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

In resolving motions for judgment on the administrative record under RCFC 52.1(c) the Court conducts a "trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Court reviews "all the disputed and undisputed facts," to determine if the protester "has met its burden of proof that an award is arbitrary, capricious . . . or violates to prejudicial effect an applicable procurement regulation." *Tech. Sys., Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001); *see also DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 661 (2010).

### B.  *ICE's Failure to Address OCI Allegations*

The Court begins its OCI analysis by attending to the (silent) elephant in the room. The record before the Court includes evidence of what triggered Point Blank's OCI allegations (the FBI Report and Point Blank's subsequent communications with the FBI); it includes Point Blank's futile attempt at raising this issue with the CO; and it includes the United States' position on those issues *today*. Yet, conspicuous by its absence is any evidence of the CO's response to

the OCI allegations at the time Point Blank raised those issues with the CO. (*See* Pl.'s TRO Mot. at 37 (arguing that ICE "wholly ignored" the issue); Pl.'s Mot. for Summary Judgment ("MJAR") at 18, ECF No. 48-1 ("The Agency's decision to entirely ignore the OCIs was irrational and a violation of procurement regulations")).

In justifying the CO's silence, Defendants contend that Point Blank's "OCI theory" is so "far outside the circumstances" covered by FAR's OCI provisions that there was "nothing for the [CO] to consider or memorialize in writing." (Int.-Def.'s Resp. to TRO Mot. at 17, ECF No. 34; *see also* Def.'s Cross-Mot. for Summary Judgment ("XMJAR") at 29, ECF No. 50 ("[T]he [CO] complied with the FAR in not documenting an OCI that he concluded did not have significant potential.")). Defendants find support for this argument in FAR 9.504(a), citing cases in which the Court has interpreted that provision to hold that agencies do not need to document their OCI analysis if they find that "no significant potential conflicts" exist. *See e.g.*, *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010); *see also Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386–87 (Fed. Cir. 2011); *McVey Co. v. United States*, 111 Fed. Cl. 387, 407–8 (2013). The Court rejects the Defendants' argument that the CO's decision to not document the OCI assessment can be justified by relying on FAR 9.504(a) or cases interpreting that provision.

FAR 9.504(a) is solely concerned with contracting officers' responsibility to analyze all "planned" acquisitions to "[a]void, neutralize, or mitigate significant potential conflicts." It goes without saying that FAR 9.504(a) therefore governs the CO's documentation responsibilities during the planning stage, *before* the solicitation is issued, and before any of the offerors arrive on the scene, hence, the Federal Circuit's use of the term "*preliminary* analysis" to describe the CO's § 9.504(a) responsibility. *Turner Constr.*, 645 F.3d at 1386 (emphasis added); *See also PAI Corp.*, at 1352 ("This regulation requires a contracting officer to identify and evaluate potential conflicts in *the early stages of the acquisition process*.") (emphasis added). FAR 9.506(d) is further evidence that FAR 9.504(a) primarily speaks to the CO's OCI analysis responsibilities before issuing the solicitation. Referencing again "*significant* potential organizational conflict[s] of interest," FAR 9.506(d) states that if the CO identifies such a conflict, the CO must inform other officials and prepare a mitigation plan "*before* issuing the solicitation." (emphasis added). Understandably, in many cases, the evidence of a potential OCI surfaces after the award or the OCI allegation is not raised with the agency until litigation ensues. In such cases, the Court has acknowledged the contracting officers' broad discretion in conducting this preliminary OCI analysis and held that the absence of documentation of the CO's analysis is normally only indicative of the fact that the CO did not identify any significant OCIs (and not that the CO violated FAR 9.504(a)). *See e.g.*, *Turner Constr.*, 645 F.3d at 1386 ("Although the FAR requires a contracting officer to identify and evaluate potential conflicts in the early stages of the acquisition process, § 9.504(a) does not require that this preliminary analysis be documented in writing."); *CACI Inc.-Fed. v. United States*, 2023 U.S. Claims LEXIS 1659 *24 (Fed. Cl. July 6, 2023) (". . . CO was not bound to document his preliminary analysis at all, let alone adhere to a page minimum"); *see also* FAR 9.505 ("The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it."). Therefore, the Federal Circuit has found that "[i]f the first time an allegation or evidence of a potential OCI appears is after award," courts can allow "post-award OCI analyses," and "evidence developed in response to a bid protest," to "clear the air of any OCI taint by showing that no significant OCI existed." *Turner Constr.*, 645 F.3d at 1386; *see also Netstar-1 Gov't Consulting, Inc. v. United*

*States*, 101 Fed. Cl. 511, 521 (2011) (finding that delay in conducting OCI analysis "in and of itself, is not indicative of arbitrary action," when the existence of a potentially significant conflict of interest "is not [] apparent before the issuance of a solicitation," and could not have been identified "until after an award and a bid protest").

But FAR 9.504(a), and the cases involving post-award OCI allegations, are not the be-all and end-all of the analysis, because here, an offeror directly raised an OCI allegation with the CO *after* the planning stage but *before* the award determination. FAR's requirement in such cases are not governed by § 9.504(a) but its neighboring provision, § 9.504(d).

Unlike § 9.504(a), § 9.504(d) does not include any temporal conditions and therefore speaks to the contracting officers' ongoing OCI-related responsibilities throughout the procurement process. *See Jacobs Tech v. United States*, 100 Fed. Cl. 198, 210 (2011) (noting that in addition to the FAR's requirement for preliminary OCI analysis, contracting officers have an "an ongoing responsibility to identify and evaluate potential OCIs"); *Netstar-1,* 101 Fed. Cl. at 521 (contracting officers may not "ignore and not evaluate known potential OCIs," that arise "prior to award."). Therefore, the differences between § 9.504(a) and § 9.504(d) are crucial. *See Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("In construing regulatory language, we must read the disputed language in the context of the entire regulation as well as other related regulatory sections in order to determine the language's plain meaning."); *Suwannee River Fin., Inc. v. United States*, 7 Cl. Ct. 556, 560 (1985) ("It is axiomatic that regulations must be interpreted to give meaning to every word, particularly where doing so leads to an entirely sensible interpretation of the provision in question.").

FAR 9.504(d) reads: "In fulfilling their responsibilities for identifying and resolving potential conflicts, contracting officers should avoid creating unnecessary delays, burdensome information requirements, and excessive documentation. The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists." Unlike § 9.504(a) (or § 9.505 which describes the CO's broad discretion in identifying OCIs), the term "significant" does not appear in § 9.504(d), with the drafters instead opting for the phrase "substantive issue" to outline the CO's documentation requirement. The Court's assessment consequently focuses on whether the OCI allegations raised a "substantive issue" and not if they amounted to a "significant potential conflict." While all significant OCI allegations involve substantive issues, not all substantive OCI issues are necessarily significant. Nonetheless, § 9.504(d) requires contracting officers to formally document their assessment of OCI allegations so long as they involve substantive issues.

Courts normally interpret the word significant to mean consequential or having the potential to cause direct impact. *See e.g.*, *New River Valley Greens v. United States DOT*, 1998 U.S. App. LEXIS 22127 *11 (4th Cir. Sept. 10, 1988) (finding that regulations requiring preparation of environmental impact statement in response to "significant" new circumstances allowed the agency to disregard developments that were "inconsequential"); *see also PAI Corp.*, at 1352 ("A significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process."); *Significant*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/significant (last accessed Nov. 24, 2023) (defining "significant" as "having or likely to have influence or effect"). As such, significant OCIs are those that demand immediate action beyond just documentation of

the OCI analysis; the FAR envisions this same meaning because it anticipates that identifying any significant OCI, under 9.504(a), will automatically trigger a plan to "avoid, neutraliz[e], or mitigat[e]" it. *See also Turner Constr.,* at 1386 ("The FAR therefore requires mitigation of 'significant potential conflicts.'") (citing *PAI Corp.*, 614 F.3d at 1352).

Meanwhile, substantive simply means worthy of consideration—or in this case further investigation. *See e.g., Avid Identification Sys. v. Crystal Imp. Corp.*, 603 F.3d 967, 974 (Fed. Cir. 2010) (finding that the word substantive can mean "relat[ing] to the content" of a decision, and "not wholly administrative or secretarial in nature"); *Hutchins v. Champion Int'l Corp.*, 110 F.3d 1341, 1344 (8th Cir. 1997) (defining "substantive" as "considerable"); *Turner Constr.,* 645 F.3d at 1386 (noting that the FAR does not necessarily "require mitigation of other types of conflicts," like "potential non-significant conflicts"). Consistent with this difference in meaning, instead of mentioning the CO's mitigation responsibility (as FAR 9.504(a), 9.505, and 9.506(d) do for *significant* OCIs), § 9.504(d) only demands formal documentation of "[t]he contracting officer's judgment," in response to *substantive* OCI issues. This language insinuates that in many cases in which no further corrective action (such as preparing a mitigation plan) may be needed, the CO's judgment to that effect needs to be documented nonetheless.[4]

While Point Blank's OCI allegations may not be significant, they are self-evidently substantive. In fact, Defendants' desperate fact-finding mission in response to this litigation is itself enough evidence to show that the OCI allegations involve at least substantive issues, in that they require at least an investigation of facts unknown to Point Blank. Both Defendants' responses to the OCI allegations are replete with citations to declarations containing factual assertions that—by all indications—appear nowhere else in the administrative record. These range from declarations that seek to clarify the nature of TYR's contractual relationship with the FBI, to the degree of communications between ICE and the FBI in planning the procurement, or any communications between ICE and TYR. (*See e.g.*, TRO OA Tr. at 77:8–14 (arguing that no OCI exists because TYR and BRF did not exchange testing results while acknowledging "that's not . . . technically part of the administrative record")). Most of these facts would clearly be unknown to Point Blank, and many of them reside with sources more readily available to the United States than Point Blank. In describing the procedures for addressing OCIs, FAR 9.506(a) charges the CO with this fact-finding responsibility:

> If information concerning prospective contractors is necessary to identify and evaluate potential organizational conflicts of interest or to develop recommended actions, contracting officers first should seek the information from within the Government or from other readily available sources. Government sources include the files and the knowledge of personnel within the contracting office, other contracting offices, the cognizant contract

---

[4] The Court notes that FAR 9.506 views the contracting officer's role in addressing significant OCIs as only "recommending a course of action," and therefore effectively charges "the chief of the contracting office" with the final judgment, whereas § 9.504(d) anticipates that documentation of the "contracting officer's" judgment would suffice to address any substantive OCI issues, without the need to move up the chain.

administration and audit activities[,] and offices concerned with contract financing.

When addressing the merits of an OCI allegation requires reviewing information that is normally outside of the bid documents, the allegations are at minimum substantive, if not significant. *See also Beta Analytics Int'l, Inc v. United States*, 61 Fed. Cl. 223, 227–28 (2004) (no documentation of OCI analysis was needed when "[a]ll of the information" that the agency needed to make the OCI determination "was included in the record."). In such cases, it is incumbent upon the agency to document that information and memorialize the CO's judgment against those background facts needed to address the substantive issues. *See e.g., Netstar*-1, 101 Fed. Cl. at 522 (finding that FAR provisions "expect more" of agency officials than to "sit passively by," when notified of a potential OCI that might demand consultation of "the agency's own records"); *see also* Matter of Analysis Group, LLC, 2009 CPD ¶ 237 at 4 (2009) ("[A]n agency may not, in effect, delegate to the contractor itself complete responsibility for identifying potential OCIs.").

Defendants' position confuses the CO's responsibility in neutralizing "significant" OCIs (through preparing mitigation plans) with the CO's responsibility to document their judgment on "substantive" OCI issues as they arise. (Int.-Def.'s Reply. at 15 (arguing that "there was no 'substantive' or 'significant' OCI concern . . . there was therefore no obligation to document [the CO's] analysis."). It is true that the first step in addressing significant OCIs under § 9.504(a) is for the CO to identify such OCI, and the documentation requirement, in the form of a plan to nullify that OCI, only follows from there. The CO's failure to identify a significant OCI relieves the CO of the obligation to produce a plan or analysis that explains the CO's mitigation efforts; and the Court adopts the presumption that the absence of documentation is reflective of the CO's decision. *PAI Corp.*, 614 F.3d at 1353 ("[T]he contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment are deemed not to be significant.").

Under § 9.504(d), in contrast, documentation is required "when a substantive issue concerning potential organizational conflict of interest *exists*," (as opposed to identified by the CO as required under 9.504(a)). (emphasis added). This means that in many scenarios envisaged by § 9.504(d), the substantive OCI issue may be identified by someone other than the CO (for example, the offerors). In such cases, the CO's judgment should still memorialize the CO's assessment of the OCI's merits (to assist effective judicial review), including explaining why despite raising a "substantive issue," the OCI claims are not significant enough to require further action. *See Command Mgmt. Servs. v. United States*, 111 Fed. Cl. 279, 284 n.4 (2013) ("[T]o perform an effective review pursuant to the APA, the court must have a record containing the information upon which the agency relied when it made its decision . . . ."); *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 100 (2011) (finding that "a bid protest which is being litigated largely on the basis of post hoc declarations," is not "tenable as a legal matter," because bid protests are to proceed in accordance with the APA standards and "not on the basis of a new record addressed by the parties in court"). The Court finds that the CO should have formally documented his judgment in response to the OCI issues raised by Point Blank and the CO's failure to do so violated FAR 9.504(d).

11

This analysis of the exact relationship between § 9.504(a) and (d) is perhaps overdue and invited by the sheer novelty of the facts in this case. Neither the Court nor the parties are aware of any OCI cases from recent memory when the agency elected to not say a word in response to an OCI allegation raised by an offeror. (*See* Mot. to Amend. OA Tr. 24:8–18; 29:1–9). In fact, a quick survey of the cases before the Court reveals that contracting officers routinely engage in extensive discussions with the offerors when OCI issues are raised directly during the procurement process, and in such cases, contracting officers normally memorialize their assessment of OCI claims in some form in the record. *See e.g.*, *Aetna Gov't Health Plans, Inc.*, B-254397, 1995 U.S. Comp. Gen. LEXIS 502 *10, 1995 WL 449806 *8 (Comp. Gen. July 27, 1995) (CO prepared "the [seven]-page document," that "contained representations regarding past and present facts," applying to the OCI issue); *Turner Constr.*, 645 F.3d at 1381 (after "[s]ome signs of a potential OCI arose during the procurement process," the Army official "exchanged emails about whether any potential OCIs existed," and met "with the contracting officer [] to discuss the situation."); *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 317 (2012) ("[I]n response to [an offeror's] concern, the Corps conducted an OCI investigation prior to awarding the contract" and "reported [its] conclusions" that "[t]here is no reason to believe any type of OCI exists."); *Samsara Inc. v. United States*, 166 Fed. Cl. 457, 469 n.8 (2023) (the agency responded to questions regarding OCI during the question-and-answer period); *Jacobs Tech*, 100 Fed. Cl. at 203 ("After the offerors submitted their proposals and the agency completed the Competitive Range Determination, the Contracting Officer conducted a second OCI analysis based on concerns raised by the source selection authority"); *Am. K-9 Detection Servs., LLC v. United States*, 2021 U.S. Claims LEXIS 334 *49 (Fed. Cl. Mar. 19, 2021) (the CO responded to the party raising the OCI issue with an email that included the "Government's conclusion"); *Trident Techs., LLC v. United States*, 158 Fed. Cl. 342, 348 (2022) (the Army drafted a memorandum for the record noting that the "agency was unable to determine whether an OCI existed . . ."); *IBM Corp. v. United States*, 119 Fed. Cl. 145, 160 n.14 (2014) (prior to issuing the award the contracting officer prepared a memorandum which "reflect[ed] that she read the ethics opinion, consulted with counsel, spoke with [offeror], and found insufficient evidence," that an OCI existed); *McTECH Corp. v. United States*, 105 Fed. Cl. 726, 728 (2012) (the contracting officer reached out to the offerors and inquired about potential OCI after receiving an "anonymous telephone call" raising an OCI issue). This leaves the Court with the firm conviction that ICE engaged in an imprudent practice in handling its responsibilities to address substantive OCI issues.[5] Each of the aforementioned examples satisfies the modest requirements of § 9.504(d) to simply document the CO's judgment in response to a substantive OCI allegation. But here, ICE left absolutely no trace of the CO's impressions on the OCI

---

[5] The United States represents that ICE's response was at least partly driven by ICE's urgent need to acquire gear by a specific deadline. (TRO OA Tr. 80:23–81:3). As the Court has noted, "procurement regulations cannot be cast aside when an emergency situation arises." *Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 612, 620 (2005). Furthermore, under FAR 9.503 the Agency "may waive," application of general OCI rules when their "application in a particular situation would not be in the Government's interest." The Agency did not then and has not yet elected to exercise that option.

allegations in the record.[6] Subsection 9.504(d) might be the shallow end of the OCI requirements, but somehow, ICE has found a way to drown.

To assess if the Agency's award determination can be sustained in light of this error, the Court must still assess if the violation was prejudicial to Point Blank. *Cubic Def. Sys. v. United States*, 45 Fed. Cl. 450, 473 (1999) ("Even a significant error in the procurement process does not entitle protestor to relief absent a showing that the error prejudiced the protestor.") (citing *Candle Corp. v. United States*, 40 Fed. Cl. 658, 665 (1998) and *Statistica Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)); *ORCA Nw. Real Estate Servs. v. United* States, 65 Fed. Cl. 1, 5 (2005) (finding that "even in the event of a procedural violation," a bid challenge will only be sustained "if the violation was prejudicial to the protestor"). The Court therefore must determine if Point Blank had a "substantial chance" of "receiv[ing] the contract award but for [the] error," identified. *Statistica, Inc.*, 102 F.3d at 1582; *see also Bear Mountainside Realty LLC v. United States*, 2023 U.S. Claims LEXIS 2524 *69 (Fed. Cl. Sept. 28, 2023) ("Even if the [agency] had violated [its] documentation requirement," the protester must show that "it would have been prejudiced by this failure"). This question involves reviewing the merits of Point Blank's OCI allegations.

The Court's focus in reviewing the validity of agency action is the administrative record, and if that record lacks the CO's judgment on the OCI allegations then the existing record is insufficient to permit meaningful review consistent with APA requirements. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). In this case, the United States has acknowledged that the record does not capture the CO's reasoning and evaluation of the actual merits of the OCI claims. (*See* Def.'s Mot. to Amend AR, ECF No. 67). Defendants therefore have argued that if the Court finds that the CO made an error in not documenting the OCI analysis, the appropriate remedy is to remand the matter first to give the CO the opportunity to document the merits of the OCI claim that can later be reviewed. (*See* MJAR OA Tr. at 83:18–25 (the United States arguing that "the appropriate path is a remand"), ECF No. 73; *see also id*.

---

[6] It is worth noting that § 9.504(d)'s explicit requirement for "formal" documentation still implies that in many other cases where the OCI allegations do not even rise to the level of "substantive," the record would still contain at least some "informal" documentation of the CO's response. Here, the record does not even contain any informal documentation of the CO's response. While the United States has noted that such informal assessment indeed took place, with the CO consulting with agency counsel in response to the OCI allegations, the United States elected to invoke privilege as to those communications without filing a privilege log despite the Court's invitation. (*See* MJAR OA Tr. 77:19-24 (The Court: "You had the option, as I've noted to file a privilege log and . . . [y]ou chose not do so. You had the option when we were considering nonmerits issues . . . .")).

85:15–21, 86:8–13 (Intervenor-Defendant arguing that "if the Court remains concerned about the lack of a documented OCI analysis . . . that a remand would be an appropriate remedy")).[7]

While the Court finds that the OCI issues raised by Point Blank are substantive enough to merit documentation of CO's reasoning and judgment, without that reasoning documented, the Court finds the record insufficient to address the merits of the OCI claim and whether TYR should be disqualified. *See Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997) ("The [C]ourt should not substitute its judgment for that of a procuring agency . . ."). When the limited record before the court precludes a final determination as to merits, remanding the matter to the agency can "appropriately avoid[] invading the province of the agency and substituting the court's judgment for that of the agency." *Cooley v. United States*, 76 Fed. Cl. 549, 559 (2007); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Impresa*, 238 F.3d at 1338–39 (noting that an agency should "take whatever steps it needs to provide an explanation," to enable the court to evaluate its reasoning and "that remand to the agency for an explanation is the 'preferred course.'") (quoting *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)).

In addition, the Federal Circuit has held that an "inadequately supported" agency decision "need not necessarily be vacated," when remand is appropriate. *Nat'l Org. of Veterans' Advocates*, 260 F.3d 1365, 1380 (2001). Remand without vacatur is appropriate when "the agency can provide a reasonable explanation for its decision[,] . . . [b]ut it has not yet done so." *Id.*; *see also Rollock Co. v. United States*, 115 Fed. Cl. 317, 334 (2014) (remanding to complete the "factual record before the Court," when the agency "did not act on a number of [] claims," and when "it left silent matters unresolved"). In particular, it is appropriate for the Court to exercise that option when the remand period is short and when the Court has already decided that the balance of equities does not favor suspending performance until a final decision is reached. (*See* MJAR OA Tr. 74:13-20, 88:10-13 (Defendants arguing that a short remand period should suffice as the Agency has already documented parts of its analysis to expedite any potential remand proceeding); *see also* TRO Order at 12–14 (denying TRO)); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 767 (Fed. Cir. 2021) ("The Court of Federal Claims has relatively broad authority under 28 U.S.C. § 1491(b)(2) to fashion a remedy."). Finding that the record before the Court contains "insufficient evidence" to evaluate the merits of the OCI claims (which are necessary to determine if Point Blank would have had a substantial chance of receiving the award), the Court remands without vacatur for further documentation of CO's OCI judgment. *See e.g.*, *Knowledge Connections, Inc. v. United States*, 76 Fed. Cl. 6, 21 (2007); *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 311 (2021); *IAP Worldwide Servs. v. United States*, 160 Fed. Cl. 57, 85 (2022).

---

[7] Point Blank argues that a remand may be unnecessary because the CO's silence is tantamount to "a determination [that] an OCI does not exist," and remand would only involve acknowledging certain facts behind that finding and explaining why the Agency did not need to take further action to mitigate the OCI. (MJAR OA Tr. 97:17-98:2). But as the Court holds today, that is precisely what FAR 9.504(d) requires: for the CO to document the agency's path to reaching its conclusion when the underlying issues are substantive enough to require a response—as they are in this case—even if not significant enough, in the agency's eyes, to require further action.

### IV.    Conclusion

For the stated reason, the Court **REMANDS** this case to ICE under RCFC 52.2(b). The Court **ORDERS** that:

(1) The remand period shall terminate **after 14 days, on December 11, 2023**.

(2) Final ruling on Plaintiff's MJAR and Defendants' Cross-MJARs **SHALL BE STAYED** pending expiration of the remand period.

(3) On or before expiration of the remand period, the United States **SHALL FILE** the administrative record of the remand proceeding to include:

    a.  the CO's complete documented analysis of Point Blank's OCI claims;

    b.  a detailed timeline of the CO's investigation and review of the OCI claims; and

    c.  the CO's judgment as to the OCI claims as required under FAR 9.504(d).

(4) To the extent that the CO's OCI analysis relies on consultation or communications with other officials, the memo shall identify those officials by their name and/or position or title. Such references should also describe the nature and degree of each official's familiarity with the underlying procurement or the FBI research and study.

(5) During this remand period, the United States is not enjoined from proceeding with the contract at issue.

The Court **ORDERS** the parties to meet and confer and file a Joint Status Report proposing redactions to this Order by December 8, 2023.

The Clerk is **DIRECTED** is to serve a certified copy of the redacted remand order, once filed, on the United States Immigration and Customs Enforcement at the following address:

Tony Ross
U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE)
Contracting Officer, Office of Acquisition Management (OAQ)
Mission Support Division, Orlando Field Office
9495 Delegates Drive
Orlando, FL 32837

Pending the Parties' proposed redactions, the Court **ORDERS** the United States to provide an unredacted copy of this Opinion and Order to the contracting officer, which shall constitute service pursuant to RCFC 52.2(b)(2).

**IT IS SO ORDERED.**



s/      David A. Tapp____
DAVID A. TAPP, Judge